

# NUMBER 13-24-00505-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**EDGAR REYES,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

## ON APPEAL FROM THE 476TH DISTRICT COURT
## OF HIDALGO COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices Silva and Cron
Memorandum Opinion by Chief Justice Tijerina**

Appellant Edgar Reyes was convicted of two counts of reckless injury to a child, a second-degree felony. *See* TEX. PENAL CODE § 22.04(e). He was sentenced to concurrent sentences of twenty years' imprisonment for each count. By two issues, which we have reorganized and renumbered, appellant contends that (1) his dual convictions violate double jeopardy principles, and (2) he was entitled to an instruction on concurrent

causation. We vacate in part, modify the judgment, and affirm as modified.

## I. PERTINENT FACTS

On May 12, 2020, appellant was indicted by a grand jury for the death of four-month-old, D.V. [1]: Count One was for capital murder; Count Two was for murder; Count Three was for injury to a child; and Count Four was for injury to a child by omission. At trial, appellant, who was the boyfriend of D.V.'s mother's, claimed that D.V.'s injuries occurred when D.V. fell off the bed. Appellant argued, among other things, that D.V. had a preexisting blood disorder, which contributed to his injuries and death.

At trial, Oscar Tijerina, M.D., the doctor who initially treated D.V. on February 20, 2020, stated that appellant "was caring for the child when he began to have difficulty breathing." Appellant then took D.V. to the neighbor's residence who called emergency services. Medical records indicate that D.V. was unresponsive and not breathing. D.V. was transported to the hospital and arrived as a code blue at 3:54 in the afternoon due to cardiac and respiratory arrest. D.V. was intubated and had a pulse, and Dr. Tijerina ordered a computed tomography scan (CT scan) of D.V.'s head. There were no visible injuries on D.V.'s body. However, Dr. Tijerina noted that the CT scan showed that D.V. had a subarachnoid hemorrhage, and he also observed retinal hemorrhaging. Dr. Tijerina reviewed D.V.'s past medical records, which indicated that he was born healthy and had

---

[1] To protect the identity of the child victim of this case, we refer to him by his initials and do not identify his mother. *See* TEX. CONST., art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process"); TEX. R. APP. P. 9.10(a)(3) (protecting the privacy of "any person who was a minor at the time the offense was committed" by designating the minors' names, dates of birth, and home address as "[s]ensitive data" requiring redaction); *see also Perez v. State*, 689 S.W.3d 369, 374 n.1 (Tex. App.—Corpus Christi–Edinburg 2024, no pet.) ("Out of an abundance of caution, we will also use initials to identify [his] immediate family members.").

no cardiac malfunction. Dr. Tijerina did not believe that D.V. had a bleeding disorder because D.V. did not have a lot of bruises on his skin, and there were no fractures to his arms, head, back, or other body parts. Dr. Tijerina did not believe that D.V. had a blood clotting disorder based on his review of D.V.'s blood report.

Dr. Tijerina suspected that D.V. suffered from abuse due to the bilateral retinal hemorrhaging, which was inconsistent with D.V.'s medical history. Dr. Tijerina indicated that D.V. had severe brain damage and hemorrhages in both eyes, which he explained was "in the back part of the eye." Through his course of treatment, Dr. Tijerina determined that D.V. suffered from shaken baby syndrome.[2] According to Dr. Tijerina, shaken baby syndrome is "composed of several symptoms and signs . . . that happen[] to babies usually under one year of age, when they are shaken and the head flops back-and-forth and that causes damage to the brain." Dr. Tijerina said that a person who injures a baby in this way "must use a lot of force." D.V. had bleeding in the back of the eye, which Dr. Tijerina opined is caused by "a lot of force," and the lack of visible physical injuries "is part of the diagnosis" of shaken baby syndrome. D.V. had an "[e]xtra-axial hemorrhage with abnormal hyperdensity over the parietal convexities," meaning that there was a hemorrhage, i.e., blood, "outside of the brain but it's within the skull," which according to Dr. Tijerina "shouldn't be there." D.V. had an abnormal subarachnoid hemorrhage which is bleeding in the space between the brain and the membrane that covers the brain called the subarachnoid space. There was also blood in D.V.'s temporal lobe margins, which

---

[2] We note that shaken baby syndrome is now also known as abusive head trauma, and some of the doctors referenced the condition as such. However, to remain consistent we will continue to refer to it as shaken baby syndrome.

according to Dr. Tijerina is not normal.[3] D.V. was transferred to the children's hospital.

William Norberg, M.D., a pediatric cardiac intensive care specialist who treated D.V. at the children's hospital, testified that D.V. suffered a "devastating neurologic injury" and found D.V. unresponsive to touch or a pinch to his skin. Another CT scan was performed at the children's hospital. Dr. Norberg admitted that initially he had believed that a CT scan taken at the children's hospital showed no brain trauma and that he had not reviewed the CT scan taken at the first hospital.[4] Thus, because he did not "really" know what had happened to D.V., Dr. Norberg initially speculated that D.V. suffered from sudden infant death syndrome (SIDS), which is a diagnosis that occurs in cases where an infant stops breathing and later suffers a cardiac arrest "for reasons that nobody has clearly defined." Dr. Norberg testified that he was not told that appellant claimed that D.V. had fallen or experienced trauma, so he "had no good evidence given . . . that there was physical trauma of a fall or any injury with it." Dr. Norberg stated that if he had been informed that D.V. had fallen, his thought process concerning SIDS would have changed.

Dr. Norberg testified that now that he has been provided with more information, he has changed his initial diagnosis from SIDS to that of shaken baby syndrome. Dr. Norberg stated, "The retinal hemorrhages that we eventually learned about and the intercranial bleeding is . . . the hallmark of shaken baby syndrome. So that's how we diagnose shaken baby syndrome, with those depending very heavily on those findings." Dr.

---

[3] The images of the CT scan were shown to the jury while Dr. Tijerina explained where the blood was located.

[4] Evidence was presented that the radiologist who initially reviewed D.V.'s CT scan made a mistake in his report that Dr. Norberg reviewed.

4

Norberg explained that the injuries D.V. suffered "usually relate[] to very significant trauma," and "we just don't find those on a CT scan on the normal child who's . . . not had an intervention of some type where somebody has done something with them. So[,] it usually relates to trauma, very significant trauma" such as "rapid acceleration [and/or] deceleration type of injuries." Dr. Norberg opined that shaken baby syndrome presents with the child having retinal hemorrhages in addition to the "tiny, fragile blood vessels within the brain tearing a little bit and we'll get small hemorrhages in various different place in the brain." According to Dr. Norberg, children with SIDS do not have the type of injuries that D.V. had, including subdural hematomas, subarachnoid hemorrhaging, and retinal hemorrhages. Dr. Norberg did not believe D.V. had a pre-existing bleeding disorder based upon his review of D.V.'s blood report.[5]

D.V.'s mother testified that during the police investigation, she and appellant went back to the home where D.V. was initially injured. D.V.'s mother stated that while there, appellant told her for the first time that D.V. "had fallen down." However, Crystal Guerra, a criminal investigator with the Alton Police Department, testified that when she spoke

---

[5] Several other doctors testified that D.V.'s injuries were consistent with shaken baby syndrome, that the injuries were not from a fall, and that he did not have a preexisting condition that caused his injuries. Alhabshan Rashed, M.D., who performed an eye exam on D.V. while he was at the children's hospital, testified that he believed that retinal hemorrhages were caused by shaken baby syndrome because of the location of the hemorrhages and because were "widespread." Samuel Serna, M.D., a neurological radiologist at the children's hospital where D.V. was treated, reviewed D.V.'s CT scan after D.V. died and admitted that he erroneously found that there was no brain bleeding in the CT scan taken at the children's hospital, and that "looking back at the imaging studies, there was a bleed, absolutely . . . that I did not report." Norma Jean Farley, M.D., the forensic pathologist who performed the autopsy on D.V., testified that she did not believe that D.V. had a bleeding disorder and rejected the claim that D.V. suffered such life-threatening injuries from a fall. Frank Walter Scribbick III, M.D., examined D.V.'s eyes postmortem and determined that the retinal hemorrhages were consistent with shaken baby syndrome and not likely caused by an accident. Kyrstal Gibson, M.D., the State's expert on child abuse, testified that it is "highly unlikely" that D.V. received his injuries by falling as appellant claimed, that D.V.'s injuries are consistent with shaken baby syndrome, and that there was nothing in D.V.'s medical records that show he was not a healthy child prior to the trauma he suffered.

5

with appellant on February 20, 2020, the day that D.V. stopped breathing, appellant did not inform her that D.V. had fallen.

An officer who participated in the investigation testified that when appellant was being questioned, appellant was told that D.V. was not breathing on his own and had trauma to his eyes, but appellant did not inform the officer that D.V. had fallen. Evidence was also presented that appellant falsely told police he had been with D.V. for about twenty-five minutes before he stopped breathing and that D.V. was on a nebulizer due to breathing problems. Appellant also lied to police about his identity at the scene of the incident. Evidence was presented that an investigator asked appellant if he shook D.V., and appellant said that he had been running fast while carrying D.V., and he was bouncing D.V.

Narciso Hernandez, Jr., a former CPS special investigator, testified that he spoke with appellant on February 24, 2020, regarding a neglectful supervision allegation, and appellant lied to him about his identity. Hernandez learned from law enforcement that "when he was getting magistrated [appellant] fessed it up and gave his correct name." During the interview, appellant did not ask Hernandez about D.V.'s condition. Hernandez testified that appellant had previously told police that D.V. "had not fallen." Hernandez stated once appellant claimed that D.V. had fallen, he accompanied appellant to the apartment where the incident occurred so that appellant could "demonstrate . . . how the child fell." Appellant provided several demonstrations of how he claimed D.V. fell from about eighteen to twenty-seven inches off a bed.

Appellant requested a jury charge instruction on concurrent causation, arguing that D.V. had a preexisting blood disorder. The trial court denied the request. However, the

6

jury charge included, in pertinent part, the lesser included offenses of reckless injury to a child for Count Three and of reckless injury to a child by omission for Count Four. *See id.* The jury acquitted appellant of Counts One and Two and convicted appellant of Count Three for the lesser-included offense of reckless injury to a child and Count Four for the lesser-included offense of reckless injury to a child by omission.[6] This appeal followed.

## II.   DOUBLE JEOPARDY

By his first issue, appellant complains that his dual convictions for injury to the same child by both an act and an omission violate his right against double jeopardy. The State concedes error and asks us to vacate one of appellant's convictions.

It is well-settled that pursuant to the Fifth Amendment, multiple punishments for the same offense violate double jeopardy principles. *Whalen v. United States*, 445 U.S. 684, 688 (1980) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)); *Gonzales v. State*, 304 S.W.3d 838, 845 (Tex. Crim. App. 2010); *see* U.S. CONST. amends. V, XIV. If the double jeopardy violation is apparent from the face of the record, we may address it for the first time on appeal. *Jackson v. State*, 399 S.W.3d 285, 293 (Tex. App.—Waco 2013, no pet.) (citation modified).

> In *Jefferson v. State*, the Texas Court of Criminal Appeals noted that "the essential element of focus of the statute [section 22.04 of the penal code] is the result of the defendant's conduct . . . and not the possible combinations of conduct that cause the result." 189 S.W.3d 305, 312 (Tex. Crim. App. 2006). Whether an individual acted to injure a child or injured a

---

[6] Count One alleged that appellant committed capital murder if he intentionally or knowingly caused D.V.'s death by striking him with an unknown object, striking him against an unknown object, "or by [a] manner and means unknown or unknowable." Count Two alleged that appellant was guilty of murder if he "intentionally or knowingly commit[ted] an act or attempt[ed] to commit an act clearly dangerous to human life by striking" D.V. with an unknown object or by an unknown manner and means, and appellant "was then and there in the course of committing" the felony offense of injury to a child and D.V.'s death "was caused while [appellant] was in course of and in furtherance of" committing or attempting to commit that felony offense.

7

> child by omission are simply different manner and means for causing the same result. *See id.* Thus, the "unit of prosecution" for injury to a child is the resulting injuries, not the act or omission which caused them. *See id.*

*Id.* (alterations in original). To determine whether there is a double jeopardy violation when there are multiple convictions pursuant to the same statute, "we employ a units of prosecution analysis" by considering "whether each theory of committing the offense would cause a different type of harm to the victim." *Gunter v. State*, 673 S.W.3d 335, 343 (Tex. App.—Corpus Christi–Edinburg 2023, pet. ref'd) (citation modified).

Here, the doctors testified that appellant's act caused D.V.'s injury, and there is nothing in the record supporting the conclusion that any omission caused any injury beyond that which appellant caused by his act. *See Villanueva v. State*, 227 S.W.3d 744, 749 (Tex. Crim. App. 2007) (explaining that because the court could not point to an "omission that caused any injury beyond that which the appellant had caused by his act," the appellant could not be punished for both his act and his omission); *see also Nawaz v. State*, 663 S.W.3d 739, 747 (Tex. Crim. App. 2022) ("The allowable units of prosecution in this case are determined by how many separate and discrete statutorily defined types of injurious results Appellant's act or conduct caused."); *Ramirez v. State*, No. 11-15-00239-CR, 2018 WL 827148, at *6 (Tex. App.—Eastland Feb. 8, 2018, pet. ref'd) (mem. op., not designated for publication) (setting out that a double jeopardy violation occurred in convicting the appellant for both injury to a child by act and by omission because the doctors all agreed that the child died from blunt force trauma, and the facts did not support that an omission caused the child's death). Accordingly, we agree that appellant was subjected to multiple punishments for the same conduct in this case.

The remedy in this situation is to affirm the conviction for the most serious offense

and vacate the other conviction. *See Bigon v. State*, 252 S.W.3d 360, 372–73 (Tex. Crim. App. 2008). The offense that has the greatest sentence assessed is the most serious. *Id.* Here, neither offense has a greater sentence. However, the parties agree that we should vacate Count Four. We agree and sustain appellant's first issue and vacate Count Four.

### III.    JURY CHARGE

By his second issue, appellant contends that the trial court improperly denied his request for a jury instruction on concurrent causation.

### A.    Applicable Law and Standard of Review

"The scope of causation under the Texas Penal Code is broad, allowing courts to find causation where 'the result would not have occurred but for [the] conduct, operating either alone or concurrently with another cause.'" *Cyr v. State*, 665 S.W.3d 551, 557 (Tex. Crim. App. 2022) (alteration in original) (quoting TEX. PENAL CODE § 6.04(a)). The defendant's conduct can be the "but for" cause of the injury either "operating alone or concurrently with another cause.'" *Id.* (first quoting TEX. PENAL CODE § 6.04(a); and then quoting *Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986)). "Another cause is one in addition to the actor's conduct, an agency in addition to the actor." *Id.* (citation modified). If the defendant's conduct either alone or together with another cause is sufficient to have caused the result, the defendant remains liable. *Id.*; *see Jones v. State*, 644 S.W.2d 530, 531–32 (Tex. App.—Corpus Christi–Edinburg 1982, no pet.) ("It is an established rule in homicides that, if the act of the defendant alleged in the indictment contributed to the death of the deceased, he is responsible, though there were other contributing causes.").

The defendant is entitled to a charge instruction on concurrent causation only if he

9

produces evidence that his conduct alone was insufficient to have caused the result and produces evidence that the concurrent cause was clearly sufficient alone to have caused the result. *See Cyr*, 665 S.W.3d at 557. The Texas Court of Criminal Appeals set out an illustration to explain when a defendant is entitled to a concurrent causation jury instruction as follows:

> Two arsonists each light fire to the same house, one on the east side and one on the west side, both of which are independently sufficient to burn the house to the ground. Neither arsonist is entitled to an instruction on concurrent causation and both are criminally liable. The same result is reached if both fires would independently be insufficient to burn the house to the ground, but the combined force of the east fire and the west fire causes such a result. Only where the east arsonist can produce evidence that his fire was clearly insufficient to burn the house to the ground, and the west arsonist's clearly sufficient acting alone, would the east arsonist be entitled to an instruction on concurrent causation and potentially escape liability for the full extent of the damage caused under concurrent causation.

*Id.*

## B. Discussion

Appellant argues that there is evidence in the record that D.V. "may have suffered from a brain bleed, or at least some bleeding in the brain prior to the hemorrhages identified here." Appellant points to testimony from a physician that there "could have been prior bleeding in the brain up to three days before the incident," which is "the textbook definition of a pre-existing condition."[7]

At the charge hearing, appellant admitted that his "expert didn't say that" there was a preexisting bleeding disorder. Appellant said that there is evidence that indicates that

---

[7] We note that in his brief, appellant has not identified the exact preexisting condition that he claims D.V. had, which could have caused his injuries and death. The doctors who testified explained that there are several blood disorders including some that cause prolonged bleeding, such as hemophilia and others that are clotting disorders.

D.V. "*might have* had a preexisting condition of some sort of a bleeding disorder." (emphasis added). Appellant did not identify which disorder he claimed D.V. had. Nonetheless, appellant pointed to Dr. Norberg's and Dr. Tijerina's testimony that to diagnose a bleeding disorder, they would look for unusual bleeding, and D.V. had "unusual bleeds . . . in the mucosa, which would be the digestive tract, lungs, that territory." Appellant claimed there is more evidence to substantiate a non-identified blood disorder, including the lab results. Finally, appellant argued, "But more than anything, it is that there were signs of the bleeding disorder before the 24th." None of this evidence, even if believed, shows that a blood disorder *alone* was clearly sufficient to cause D.V.'s injuries. *See id.*; *see also Phillips v. State*, No. 05-01-01317-CR, 2002 WL 31478763, at *3 (Tex. App.—Dallas Nov. 7, 2002, no pet.) (mem. op., not designated for publication) (assuming some evidence could have established that the "appellant's actions were clearly insufficient to produce the result of [the victim's] death," yet determining that a concurrent causation instruction was not required because appellant did not show that any concurrent cause was *clearly sufficient* to cause the death).

Moreover, appellant has not shown that his conduct *alone* was clearly insufficient to have caused D.V.'s injuries as he did not direct the trial court to any evidence supporting such a conclusion, and he has not directed this Court to such evidence. *See Cyr*, 665 S.W.3d at 557. Therefore, the trial court did not abuse its discretion by failing to include a jury charge instruction on concurrent causation. *See id.*; *Hutcheson v. State*, 899 S.W.2d 39, 41 (Tex. App.—Amarillo 1995, pet. ref'd) ("Because the pathologist testified that the wound inflicted by Appellant was enough to cause death, the State met its burden."); *see also Musaka v. State*, No. 03-06-00711-CR, 2008 WL 976051, at *6

(Tex. App.—Austin Apr. 9, 2008, pet. ref'd) (mem. op., not designated for publication) (explaining that there was some evidence that supported the inference that the "appellant perceived but consciously disregarded the risk of serious bodily injury caused when he shook" the baby using "high energy violent forces"); *Higgins v. State*, No. 07-01-0384-CR, 2002 WL 1310427, at *2 (Tex. App.—Amarillo June 14, 2002, pet. ref'd) (mem. op., not designated for publication) (determining that although the appellant cited evidence he claimed could have caused the victim's death, "[He] failed to illustrate that some other yet concurrent cause was clearly sufficient to produce[] the victim's death. And, having failed to illustrate that, he also failed to establish his entitlement to the instruction."). We overrule appellant's second issue.

## IV.   CONCLUSION

Because it violates the Double Jeopardy Clause of the Fifth Amendment as previously discussed, we vacate appellant's conviction for Count Four and modify the trial court's judgment in that regard. As modified, the judgment of the trial court is affirmed.

JAIME TIJERINA
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
2nd day of July, 2026.

12